ERVIN, Justice
(dissenting) :
We were petitioned for a certiorari review of the decision of the District Court of Appeal, Fourth District, in Tiernan v. Sheldon, 191 So.2d 87, that adjudicated a second appeal in this case. The first appellate decision in this case was rendered by the District Court of Appeal, Second District, prior to the creation of the Fourth District Court of Appeal. See Sheldon v. Tiernan et al., 147 So.2d 167.
From the first appellate opinion, it appears that in May, 1961 the Petitioner filed a suit in chancery against Respondents Tiernan and East Atlantic Corporation seeking damages for breach of a 99-year lease. In the suit Petitioner sought to have an assignment of the lease from Tiernan to the Corporation set aside as being colorable and a mere paper transaction of no legal effect. Prior to trial Petitioner discovered that Respondent Gezelschap, Tiernan’s attorney, was a silent partner and co-lessee with Tiernan in the lease undertaking and Petitioner filed motion to amend and to add Gezelschap as a party defendant. After a hearing on the motion it was denied and *184 simultaneously the court, ex mero motu, entered its summary final decree holding that neither Tiernan nor East Atlantic Corporation were liable to the Petitioner-lessor. Petitioner appealed to the District Court of Appeal, Second District, which court reversed and remanded. (147 So.2d 167)
The following facts are quoted from the first opinion:
“Florence C. Sheldon on February 13, 1959 * * * leased certain real property to J. William Tiernan * * * fora period of 99 years. The lessee agreed (a) to pay annual rental in the sum of $7,-000.00, (b) to pay the taxes, (c) to construct on the leased property a building costing not less than $175,000.00 commencing not later than January 31, 1961 and (d) to pay court costs and fees incurred by the lessor in the event of lessee’s default.”
* * * * * *
“J. William Tiernan paid the rent for 1959 and 1960 and the taxes for 1959. He defaulted on taxes for 1960 and 1961 and the rent for 1961 and never commenced construction of the building although he demolished a frame structure located on the leased premises. On February 20, 1961, being delinquent under the lease, he caused to be issued a certificate of incorporation of East Atlantic Corporation. The subscribers were J. William Tiernan 500 shares, Carl Gezelschap 499 shares and Ruth Kelly, who was apparently a secretary, 1 share. J. William Tiernan immediately executed an assignment to the new corporation and the assignment contained an agreement by which the corporation assumed the terms, conditions and covenants of the lease and agreed to perform them. Article X of the lease made it freely assignable * * *. The assignment article of the lease included also the following:
“ ‘Article X(c) The obligations assumed hereunder by the respective sides * * * are all covenants running with the land and they shall pass successively * * * unto the transferee or assignee and upon the occasion of each such transfer or assignment the transferor or assignor shall be thenceforth released from any liability thereunder.(emphasis supplied).” (at 168; emphasis by District Court)
The District Court then commented:
“ * * * In view of the lessee’s covenant to construct a building on the leased property, such liberal privilege of assignment would seem to be highly improvident from the standpoint of the lessor; but in the absence of fraud or other illegality the provision is valid. It may be construed but not evaded, (emphasis added)
“There appears from the record no evidence as to whether the conditions precedent to an assignment were actually met. * * * ”
At the trial pursuant to the remand in the first appeal, the Petitioner sought (1) damages for unpaid taxes, (2) damages for unpaid rent, (3) damages for failure to construct a building with a minimum cost of $175,000.00 on the premises — said damages having been provided as liquidated damages in the lease agreement — and, (4) reasonable attorney’s fee. The chancellor found:
“ * * * that the two’ individual defendants breached said lease, formed said corporation to escape personal obligation under the lease, and that the defendants have not paid the capital stock tax of the defendant corporation, nor filed annual reports, as required by law, for four years; that they had no intention of causing the corporation to function, other than as a dumping ground for the lease; that the corporation is a fiction and, under the facts and circumstances of this case, is the ‘alter ego’ of the individual defendants. The Court holds that the Assignment of Lease to the corporation *185 is void, being an assignment by the individual defendants to themselves.”
The chancellor went on to hold Respondents Tiernan and Gezelschap personally liable to Petitioner for rent due from January 1, 1961 to January 1, 1964, with interest at eight per cent on each annual amount from due date to date paid. The chancellor further decreed that said Respondents pay unto Petitioner the amounts due for taxes each year from February 1, 1961 to February 1, 1964 with eight per cent interest on each amount due. Petitioner’s claim for damages for failure to erect a building was denied as being speculative and not proven; and attorney’s fees were held not recoverable by reason of the existence of a contingent fee contract.
Respondents appealed to the District Court of Appeal, Fourth District, from that portion of the final decree determining the assignment of the lease to the corporation to be void and ineffective, and awarding damages for nonpayment of rent and taxes subsequent to the date of assignment. Petitioner entered a cross-appeal assigning as error that portion of the final decree denying attorney’s fees, and denying damages for failure to construct the building.
The District Court held that because the lease provided it was freely assignable the assignment to the corporation “did not constitute a fraud upon anyone.” (See 191 So.2d 87, text 89.) Thus the District Court reversed the chancellor as to that part of the decree piercing the corporate veil. As to attorney’s fees, the District Court held that while Respondent lessees were not bound to pay a contingent fee, they were bound to pay a reasonable attorney’s fee for the services of lessor’s attorney in the trial of that cause in which the lessor was successful. The chancellor was affirmed in his conclusion that the damages sought for failure to construct a building on the premises were too speculative to justify an award.
Petitioner here contends that the District Court erred (1) in holding that there was a valid assignment of the lease to the corporate assignee and (2) in determining that the damages relating to lessee’s failure to build were speculative and therefore not recoverable.
Upon examination of the petition for certiorari, it appears that the result reached by the District Court in regard to the two aforementioned points conflicts with applicable principles of law announced in the following cases Petitioner cites for conflict: Sheldon v. Tiernan (Fla.App.), 147 So.2d 167; James v. Gulf Life Ins. Co., Fla., 66 So.2d 62; Quinerly v. Dundee Corp., 159 Fla. 219, 31 So.2d 533; Twyman v. Roell (1936), 123 Fla. 2, 166 So. 215, and McCall v. Sherbill (Fla.1953), 68 So.2d 362.
The Fourth District Court’s opinion appears to be in conflict with the decision of the Second District Court, which constituted the “law of the case.” There the assignment provision of the lease was under consideration, viz., whether the chancellor’s summary decree of dismissal in favor of the defendants (Respondents herein) reflected “a correct interpretation of the assignment article of the lease.”
The Second District Court disagreed with the chancellor’s construction of the assignment provision. It said:
“ * * * An agreement will not be interpreted so as to place one of the contracting parties at the mercy of the other unless it is clear that such was the intention at the time the agreement was made, and an interpretation which is naturally just will be preferred * * *."
It quoted from Quinerly v. Dundee Corp., supra, to the effect that if contractual language is doubtful so that it is susceptible to two constructions
“ ‘ * * * one of which makes it fair, customary and such as a prudent man would naturally execute, while the other interpretation [makes] it inequitable, unnatural, or such as a reasonable man would not be likely to enter into, then *186 the reasonable, logical and rational interpretation should be adopted.’ ”
The Second District Court did not accept the chancellor’s finding that the Corporation was not the alter ego of the original lessees. It reversed and remanded the case, indicating that while the liberal assignment provision was highly improvident, an assignment of the lease would be valid “in the absence of fraud or other illegality * It added, “It [the lease] may be construed but not evaded.”
Consistent with the guiding language of the Second District Court’s opinion, the chancellor on remand found from the undisputed evidence the assignment to the Corporation was an alter ego arrangement designed by the individual lessees to evade their personal obligations. However, in its review the Fourth District Court concluded the alter ego status of the Corporation and the assignment to it were immaterial considerations. It reverted to the original views of the chancellor reflected in the summary judgment and held that the language of the lease itself pertaining to assignment was decisive. Thereunder it held it was perfectly legal and free of fraud for the individual lessees to assign the lease to their alter ego and avoid further personal liability as individual lessees. The only concession the Fourth District Court made to the “law of the case” pronouncement of the Second District Court was that the alter ego arrangement would not excuse the individual lessees from liability accruing prior to the assignment. This holding, I believe, is contrary to the rationale of the Second District Court’s decision and to universally recognized equitable principles. Certainly the Second District Court did not construe the language of the lease pertaining to the assignment to be decisive in itself of the validity of the assignment to the corporation, but remanded the case for an evidentiary determination as to whether such assignment was valid in the face of plaintiff’s allegations and untainted by fraud or other illegality. Even the tentative views it expressed were qualified by the words “assuming a valid assignment to the corporation”, (text 169)
It would be straining the concept of conflict too thin to hold there was no conflict between the two appellate decisions in this case. The Second District Court recited the circumstances relating to the alter ego and assignment which included the silent partner. It disagreed with the chancellor’s summary judgment finding that the liberal assignment provision of the lease ruled out any claim of fraud in an assignment thereunder. Upon this predicate the Second District reversed the summary judgment and remanded the case for an evi-dentiary determination of the allegations of the plaintiff questioning the validity of the assignment, giving a résumé in its opinion of such allegations. It expressly stated the determination was to establish whether the assignment was valid and free of fraud or other illegality. It referred to the cases of James v. Gulf Life Ins. Co. and Quinerly v. Dundee, supra, also relied upon by Petitioner for conflict as guiding principles of law to be followed on remand. Notwithstanding this “law of the case” prelude, the Fourth District Court disregarded the fraud finding of the chancellor on remand as immaterial and held there could be no fraud in view of the liberal assignment provision. Such construction appears to be entirely contrary to the rationale of the Second District Court decision and the cases cited therein against inequitable and unnatural construction of contractual provisions. Merely because the Corporation was “duly and properly formed” and the lease “duly and properly” assigned does not remove the undisputed fraud from the transactions. The letter and form prevailed over the weightier spirit of the law.
I also find there was conflict between the decision of the Fourth District Court and the cited cases of Twyman v. Roell and McCall v. Sherbill, supra, with respect to whether damages for failure to construct the building were speculative. This con *187 flict will appear from a discussion of the merits of the case later in this opinion.
Thorough study of the merits of the case and an analysis of the facts and circumstances surrounding the instant controversy lead to agreement with the chancellor’s finding on remand that the Respondent East Atlantic Corporation was merely the alter ego of the individual respondents, and that the chancellor was justified in piercing the corporate veil. Under the liberal privilege of assignment in the lease, an assignment to a bona fide corporate entity would have been valid and would have operated to relieve the original assignor-lessees of further personal liability or responsibility under the lease. Equity, however, even under the liberal assignment provision would require that such an assignment be to a bona fide assignee, whether a corporation or a person sui juris. In the instant case the undisputed evidence refutes any claim that the Corporation was a bona fide assignee. It was found to be a sham fraudulently concocted by Tiernan and Gezelschap to evade individual liability under the lease.
It is an accepted principle that a corporation is generally considered an entity distinct from its individual members or stockholders. This general legal principle regarding the corporate entity is, however, subject to exception. As we said in Trueman Fertilizer Co. v. Allison, Fla., 81 So.2d 734,
“ * * * in an appropriate case, in furtherance of justice, a court of equity will not overlook that the stockholders are the real and substantial beneficiaries and under such circumstances, the court may ignore the corporate entity.” (at 738)
As stated in 18 Am.Jur.2d Corporations § 15, p. 561:
“ * * * The corporate entity is generally disregarded where it is used as a cloak or cover for fraud or illegality, or to work an injustice, or where necessary to achieve equity. Corporate existence as an entity distinct from its members may be ignored in order to circumvent the fraudulent purpose of the shareholders in its organization or management * * * Where a corporation is formed to accomplish a fraud or other illegal act, the fiction will be disregarded by the courts, and the acts of the real parties dealt with as though no corporation had been formed. * * *
“ * * * Actual fraud, however, is not necessarily a predicate for discarding the theory of separate corporate existence. * * * Where the corporate fiction is merely an alter ego or business conduit of an individual, it may be disregarded in the interest of securing a just determination of an action. Where the transactions are between the parties as stockholders and themselves as individuals, the fiction of corporate entity may be ignored.”
In 13 Am.Jur. Corporations § 8, p. 163, the text reads:
“The courts will not permit a person acting under the guise of a corporation formed for that purpose to evade his individual contract. * * * ”
citing Kramer v. Old, 119 N.C. 1, 25 S.E. 813, 34 L.R.A. 389, 56 Am.St.Rep. 650.
Here, the chancellor found that the original lessees were merely transacting business with themselves. They went through the sham formality of incorporation and the spurious lease assignment to evade their obligations under the lease. While the lease agreement does contain a most liberal assignment provision, it was not an absolutely unrestricted right to unilateral assignment. The lease specifically provided that
“ * * * no assignment or transfer shall be valid unless the assignee shall expressly assume and agree to perform each and every convenant of this lease which, by the terms hereof, Lessee agrees to keep and perform. * * * ”
Can it be logically contended, by any stretch of the imagination, that the purported as-signee, the East Atlantic Corporation, had *188 any ability or intention to fulfill its obligations under the lease assignment? Standing in opposition to any such farfetched contention are the following record facts:
(1) There was a capital investment of only $1,000.00 in the Respondent Corporation, yet said Corporation supposedly assumed the obligation to pay an annual rent of $7,000; to pay all taxes on said property for the lease period; construct a building on the leased premises- — said building to cost not less than $175,000.-00; and pay premiums for all insurance policies which lessee was obligated to carry under the terms of the lease. This $1,000.00 capital investment, in view of the large sums required to meet the financial obligations of the lessees under the lease, is insufficient to raise any presumption of bona fide corporate existence apart from the incorporators, the original lessees.
(2) No formal meeting of the Board of Directors of East Atlantic Corporation had ever been held.
(3) The corporation had never transacted any business whatsoever since its formation.
(4) The $1,000.00 original capital investment was paid out in attorney’s fees— leaving no cash assets.
(5) The capital stock tax of the corporation has not been paid.
(6) No annual reports have been filed as required by law.
An excellent statement appropriate to the situation at hand is found in Biscayne Realty & Ins. Co. v. Ostend Realty Co., 109 Fla. 1, 148 So. 560. There, this Court quoted with approval from Morawetz on Private Corporations, Vol. 1, § 227, which reads in part;
“In equity the conception of a corporate entity is used merely as a formula for working out the rights and equities of the real parties in interest; while at law this figurative conception takes the shape of dogma, and is often applied rigorously, without regard to its true purpose and meaning.” (at 564 of 148 So.)
We went on to say in Biscayne Realty, supra, that
“[m]any cases are in line with the views expressed above, where the corporate entity was disregarded and the persons composing it were treated in equity as the real persons in interest and liable for the obligation which they contracted in the corporate name.” (at 564)
We are not here faced with the usual fraud situation in which there must be existing indebtednesses coupled with an intent to defraud which is consummated by the debtor fraudulently transferring his property to another for the purpose of placing it beyond the reach of his creditors — in other words, actual fraud. In this case the fraud or illegality consisted in the colorable attempt of the lessees to escape personal liability by making it appear they had made a bona fide assignment to a party other than themselves. The entire transaction between the Respondent lessees and their ostensible assignment to their corporation was cloaked in the mantle of constructive fraud from start to finish. As we noted in Douglas v. Ogle, 80 Fla. 42, 85 So. 243.
“Constructive fraud is simply a term applied to a great variety of transactions * * * which equity regards as wrongful, to which it attributes the same or similar effects as those which follow from actual fraud, and for which it gives the same or similar relief as that granted in cases of real fraud.” (at 244 of 85 So.)
Thus, I agree with the final decree of the chancellor in which he said: “The Court holds that the Assignment of Lease to the corporation is void, being an Assignment by the individual defendants to themselves.”
The next point for consideration in this matter is the issue of damages for failure of the Respondents to build upon the leased premises a building costing not less than *189 $175,000.00. Article XII of the instant lease agreement is entitled “LESSEE’S OBLIGATION TO BUILD.” Section C of this article reads:
“Before commencing the building the Lessee must:
“(4) Procure and deliver unto the Lessor a guarantee that the work will he constructed and paid for, which guarantee may be accomplished either
(a) By the delivery of a bond naming the Lessor as obligee and made by the Lessee as primary obligor, with a surety authorized to do business in Florida * * * or
(b) By the delivery by the Lessee to the Lessor of a sum of money equal to twenty (20) per cent of the actual cost of the job * * * with the further understanding that if the Lessee fails to become entitled to receive the return of such sum as just hereinabove set forth and if, before the Lessee becomes entitled to receive such return the lease is cancelled for the Lessee’s default, then the said sum shall be retained by the Lessor (along with the benefits of any constructive work or improvements which the Lessee shall have theretofore placed on the premises) as liquidated and agreed upon damages accruing to the Lessor because of the Lessee’s default * * * ” (emphasis added)
Thus, as revealed by the language of the above-quoted article of the lease agreement, the parties thereto expressly stipulated that a certain amount, $35,000.00, be designated liquidated damages in event of Lessee’s default. In regard to liquidated damage provisions, we said in Lee v. Clearwater Growers’ Ass’n, 93 Fla. 214, 111 So. 722, that
“[t]he law seems well settled that such agreement for liquidated damages will be upheld in the absence of a showing that the amount is unjust, oppressive, or disproportionate to the damages that would result from a breach of the agreement.” (at 724 of 111 So.)
In the instant situation both the chancellor and the Fourth District Court were of the opinion that the damages for Lessee’s failure to start construction were too speculative to justify upholding or enforcing the aforementioned damages provision. The courts below appear to have written off or dismissed Petitioner’s claim for the amount stipulated in the liquidated damages provision because of the difficulty of determining, and the uncertainty as to amount of actual damages suffered. This approach seems to beg the question in view of the facts and circumstances of the case and to ignore the conflict of decisions resulting therefrom. Regarding conflict, it is noted from Twyman v. Roell, supra, that the uncertainty which defeats recovery has reference to cause of damage, not the amount of damages. Here, damage to the Lessor and the cause were certain due to the breach of the agreement to construct the building. The amount only was uncertain; but as we have seen, liquidated damage was agreed upon by the parties. We said in North Beach Investments, Inc. v. Sheikewitz, 63 So.2d 498, that
“ * * * when the actual damages cannot be susceptible of ascertainment by some known rule or pecuniary standard under reasonable circumstances, the stipulated amount should be regarded as liquidated damages, and the parties should be bound by their covenants and the contract so made. The prime factor in determining whether such sum is a penalty or a forfeiture is whether the sum named is just compensation for damages resulting from the breach.”
(at 499)
Some of the basic facts involved in North Beach Investments, supra, are similar to those of the instant case. That case involved a 99-year lease covering two lots in Miami Beach, one of which had an apartment on it and the other was vacant at the time the lease was entered. The lease *190 called for a ground rental of $7,500.00 annually for the two lots. In addition, the lessee was to erect at lessee’s expense before expiration of the fifth year of the lease a building on the vacant lot, such building to be substantially equivalent to the building then located on the other lot. The lessee was also to pay all taxes levied and the principal and interest payments on the then existing mortgage. A security deposit of $32,500.00 was posted to stand as security for performance by the lessee of all terms, conditions, covenants, and agreements in the lease to be kept and performed by the lessees. The covenants with relation to this deposit were, in effect, that the $32,500.00 could be retained either as liquidated and agreed upon damages, or to apply toward actual damages sustained. There was a subsequent default in payment of rent and the lessee was evicted. The lessee sought a declaration of its rights to a refund of the security deposit. This Court, in affirming the chancellor’s order that the lessors were entitled to retain the amount as liquidated damages, said:
“The damages cannot easily be ascertained. We do not know whether any other lease can be made upon the property which would recompense the lessor by the ground rental payment, the payment of existing mortgage, and taxes upon the property, to say nothing of the erection of a building upon the vacant lot by the lessee at no expense to the lessor, and other similar items. Neither is the amount of the security deposit disproportionate to the rental for the period of 99 years.” (at 500)
When the length of the lease term and all of the payment provisions of the instant lease are considered with the total scope of obligation assumed by the lessees under the arrangement, it is obvious that a stipulation having the effect of providing that $35,000.-00 be paid as liquidated damages in event of lessee’s default is not unreasonable. The expression last quoted from North Beach Investments, supra, in the immediately preceding paragraph, regarding the legal and logical propriety of such an award is applicable to the immediate cause.
To recapitulate, I conclude: (1) The assignment provision of the lease was not so liberal as to place the lessor at the mercy of the lessees to the extent the latter could form a sham corporation, their alter ego, which was without working capital and never functioned; go through the formality of assigning the lease to it, thereby retaining for themselves the leased premises and the benefits thereof, yet escaping personal liability under the lease; (2) that under the lease the lessees were to commence not later than January 31, 1961 the construction of a building on the leased premises costing not less than $175,000.00 (the purported lease assignment was not executed until after February 20, 1961); that prior to commencing such construction lessees were to deliver to lessor a bond or a sum of money equal to twenty per cent of the actual cost of the job to assure the building would be constructed, the same to be retained as liquidated damages in the case the lease was cancelled for lessee’s default. I conclude this constituted the parties’ agreement of a sum certain, $35,-000.00, as liquidated damages for failure to construct the building.
Thus, the decision of the District Court of Appeal, Fourth District, should be quashed as to those portions of its opinion holding the individual respondents not liable for said rentals, etc., due Petitioner arising subsequent to the purported lease assignment to the East Atlantic Corporation, and denying enforcement of the liquidated damages provision.
O’CONNELL, J., concurs.